**BUFFALO CREEK COOPERATIVE STATE GRAZING DISTRICT, a non-profit corporation grazing cooperative, Plaintiff,**

and

**The Montana Grass Commission, Intervenor,**

v.

**Harold TYSK, individually and as State Director, United States Department of the Interior, Bureau of Land Management, and D. Dean Bibles, individually and as Billings District Manager of Federal Grazing District No. 4, United States Department of the Interior, Bureau of Land Management, Defendants.**

**Civ. No. 744.**

United States District Court
D. Montana,
Billings Division.
Sept. 27, 1968.

---

228

Longan & Holmstrom, Billings, Mont., for plaintiff.

William S. Mather, of Cooke, Moulton, Bellingham, Longo & Mather, Billings, Mont., for intervenor.

Moody Brickett, U. S. Atty., Butte, Mont., and Clifford E. Schleusner, Asst. U. S. Atty., Billings, Mont., for defendants.

## ORDER AND MEMORANDUM OPINION

JAMESON, District Judge.

Plaintiff is an incorporated nonprofit district organized under the Montana Grass Conservation Act.[1] Defendants Tysk and Bibles are officers and employees of the Bureau of Land Management, Department of the Interior (hereinafter "Bureau"). Intervening plaintiff Montana Grass Commission (hereinafter "Commission") is an appointive state regulatory body having supervisory powers over state cooperative grazing districts, such as the plaintiff. By a document dated January 28, 1963, the plaintiff and the Bureau entered into a Federal-State Cooperative Grazing Districts Agreement (hereinafter, "agreement"), under the provisions of the Taylor Grazing Act[2] and the Montana Grass Conservation Act.

The agreement provides in pertinent part:

"I. The purpose of this agreement is to provide, through the cooperation of the signing parties in accordance with the terms and conditions hereof, for the protection, administration, regulation and improvement of the Federal land subject hereto, and to bring about improved coordination of use of such Federal land, of State District controlled lands and of privately owned lands used in connection therewith.

\* \* \* \* \* \*

"III. The *Bureau* agrees:

1. *To establish and fix, in cooperation with the State District, the graz-*

---

1. Mont.Rev.Codes Ann. § 46–2301 et seq. (1961).

2. 43 U.S.C. § 315 et seq.

*ing capacity of the Federal and District land* and to assist the State District in the preparation and execution of a range management, protection and development plan for both the Federal and District land. (Emphasis added.)

2. To issue to the State District an annual license or term permit for the grazing privileges that may be utilized on the Federal land by the State District's licensees and permittees.

3. To certify to the State District annually or for a term of years a list of applicants who would be qualified and entitled under the Federal Range Code for Grazing Districts (43 C.F.R. 161) to use the Federal land hereunder and the extent of grazing privileges to which each is entitled.

4. To notify the State District each year on or before February 15, of the annual fee to be paid to the Bureau for the use of the Federal land * * *.

\* \* \* \* \* \*

7. To issue Section 4 range improvement permits to, or to enter into cooperative agreement with the State District, or its licensees or permittees. Applications for Section 4 permits or proposed cooperative agreements shall be referred to the State District by the Bureau of Land Management for the views and recommendations of the State District, but final determination of such applications or cooperative agreement shall be by the Bureau of Land Management in accordance with the provisions of the Federal Range Code. * * *

\* \* \* \* \* \*

"IV. The *State District* agrees:

1. To use or permit the use of the Federal land for grazing purposes in accordance with Article III of this Agreement, and shall fix, subject to the approval of the Bureau, the numbers and kinds of livestock to be grazed thereon not in excess of the grazing capacity and the seasons of use.

\* \* \* \* \* \*

3. To pay all grazing fees, including range improvement fees, prescribed by the Bureau, due for the use of the Federal land at the time and in the amount specified by the Bureau.

4. To issue in accordance with its bylaws and upon such standard forms as the parties hereto may approve annual licenses or term permits not extending beyond the term of any permit issued under Article III, Section 1, to graze upon the lands subject to this agreement in such amounts and to such applicants, who, regardless of membership in the State District, have been certified under Article III, Section 3 * * *

\* \* \* \* \* \*

9. To take all necessary steps to protect the Federal land subject to this agreement from over grazing and improper use, including the cancellation, upon request of the Bureau or upon its own initiative, of the grazing privileges of any licensee or permittee misusing the Federal land or violating any provisions of the Federal Range Code.

\* \* \* \* \* \*

"VI. * * *

3. That nothing herein shall preclude the rights of the United States to fully protect the Federal land covered by this agreement and all Federal improvements thereon and all appurtenances belonging thereto, against trespass or otherwise in accordance with any applicable law or regulation."

Prior to the 1967 grazing season the Bureau was engaged in an adjudication program under the Federal Range Code[3]

---

3. 43 C.F.R. § 4110.0–5 provides in part: "(r) 'Adjudication of grazing privileges' is the determination of the qualifications for grazing privileges of the base property, land § 4110.0–5(k) (1) or water (§ 4110.0–5(p) (1)) offered in support of applications for grazing licenses or permits in a range unit or area, and the sub-

for the grazing privileges within the Buffalo Creek District. This program called for applications from individual members of the district and a determination of priorities in the use of the federal range. A part of the priority determination involved the level of use, which was based upon a range survey by the Bureau.[4]

Sometime in the spring of 1967 the Bureau completed its adjudication program and certified the 1967 grazing use in accord with its adjudication. This adjudication called for a reduction in grazing capacity from an allocation of twenty head per section to fifteen head per section. Because the 1967 certification was presented to the plaintiff after it had issued allocations to the individual range users, the Bureau agreed that it would not require compliance with the reductions for that season. The Bureau did, however, on May 2, 1967, notify the District that the "certifications for the 1968 grazing use will have to be adhered to."[5] The Bureau's certification for the 1968 season use was presented to the District on January 2, 1968.

When the District's 1968 allocations had not been conformed to the certification by March 21, 1968, the Bureau wrote plaintiff on that date giving notice of the cancellation of the agreement, effective September 25, 1968,[6] and advising the District that unless allocations were conformed to the certification by March 26, 1968, the Bureau would proceed to issue licenses to individual members of the District. A copy of this letter was sent to all members of the plaintiff District.

On March 27, 1968, the Bureau mailed individual billings to the members. 21 members paid grazing fees directly to the Bureau and received licenses for the 1968 season. In those cases in which the member did not respond, the Bureau checked in the field to determine whether the ranchers were still grazing their cattle on federal land. Where such animals were found grazing, notices of trespass were issued.

Pursuant to regulation 43 C.F.R. § 4115.2–6(d)[7], the District Manager of the Bureau, interpreting the cases of failure to secure a license as adverse actions affecting the license, notified lend-

sequent equitable apportionment among the applicants of the forage production within the proper grazing season and capacity of the particular unit or area of Federal range, and acceptance by the applicants of the grazing privileges based upon the apportionment or its substantiation in a decision by an examiner, the Director, or the Secretary upon appeal. (Applicable provisions are Subpart 4111 and § 4115.2–3)".

4. Six members of the District perfected administrative appeals from the decision of the Bureau, pursuant to the provisions of 43 C.F.R. § 4115.2–3.

5. The file does not disclose any response to this letter from plaintiff.

6. The agreement provided:
"IX. 1. This agreement may be terminated by mutual consent of either party upon six (6) months prior written notice to the other; provided that the Bureau, if it seeks termination, shall provide upon request of the State District, for a hearing to be held thereon

at a time and place convenient to the members of the State District at least sixty (60) days prior to the expiration of the six (6) months notice. Termination of this agreement or extension thereof shall not become effective during a recognized summer grazing season."
Plaintiff requested a hearing following the Bureau's notice of termination. The hearing was held June 26, 1968. On July 24, 1968 the Bureau notified plaintiff that the notice of termination was affirmed.

7. "Where a lending agency files with the District Manager notice that it has made a loan and has accepted a grazing license or permit as security therefor in conformity with the provisions of this section, the District Manager as a matter of cooperation will keep such agency advised of any adverse action affecting the license or permit, but the failure to give timely notice of such adverse action shall impose no legal liability or obligation on the District manager of the Bureau or any of its employees."

ing agencies which had filed with the Bureau notice of a lienholder's interest.

Plaintiff prays, in its amended complaint, that the defendants be temporarily restrained and permanently enjoined from (1) "sending communications to the members of the District that demand or request grazing fees or threaten trespass suits"; (2) "initiating trespass actions against any individual members"; and (3) "contacting any lending agencies of any members of the plaintiff and asserting in any form that the members have not been issued grazing licenses or permits on the Federal lands". Plaintiff also asks that plaintiff be issued a license for the 1968 grazing season.

Defendants contend that the action should be dismissed for lack of jurisdiction on the grounds that: (1) the acts complained of are discretionary in nature and not subject to judicial review under applicable statutes;[8] (2) the Secretary of the Interior is an indispensable party and has not been joined; and (3) the action is one against the United States to which it has not consented.

In Bedke v. Quinn, D. Idaho 1957, 154 F.Supp. 370, certain cattle ranchers sought relief from the action of an officer of the Bureau of Land Management under the Taylor Grazing Act in reducing their grazing privileges. The court held that action of the Bureau of Land Management in issuing permits under the Taylor Grazing Act is committed to agency discretion, provided "such discretion is not exercised arbitrarily or capriciously, and not beyond the lawful statutory authority of the agency and its officers".

With reference to the contention in that case that the Secretary was an indispensable party, the court held that a suit to enjoin a subordinate official is authorized where "the subordinate official has exceeded his authority"; but that a mandatory injunction ordering the defendant to issue permits could not be granted without joining the Secretary of the Interior, "since this would require the Secretary to take action by exercising a power lodged in him, or by having a subordinate exercise it for him".

In Sellas v. Kirk, 9 Cir. 1953, 200 F.2d 217, 220, the court upheld the dismissal of a suit to enjoin a range manager from effecting a reduction in plaintiff's permitted grazing on public lands. In construing the Taylor Grazing Act, the court held that (1) a special rule adopted by the Secretary of the Interior for the Grazing District constituted "agency action committed to agency discretion", not subject to review under the Administrative Procedure Act, and (2) the Secretary of the Interior was an indispensable party since it is "the Secretary, not the subordinate, who is authorized by the Act 'to issue or cause to be issued permits to graze livestock' on grazing districts".[9]

Plaintiff [10] does not question the rules set forth in these decisions but contends that they are not applicable under the facts of this case.[11] Plaintiff argues that under a proper construction of the Taylor Grazing Act the Bureau had express authority to enter into the agreement, and that the agreement provides for joint determination of the grazing capacity by the Bureau and the District. In this connection plaintiff calls attention to the fact that the Government owns only about 14 per cent of the lands within the District, and that the remain-

---

8. 5 U.S.C. § 701 et seq.

9. See also Richman v. Beck, 10 Cir. 1958, 257 F.2d 575, which reaches the same conclusion and contains a rather comprehensive analysis of the provisions of the Taylor Grazing Act; and opinion of this court in McNeil v. Leonard, D.C.1961, 199 F.Supp. 671.

10. Intervenor joined with plaintiff in all of plaintiff's contentions regarding the legal principles involved and the effect of the cooperative agreement.

11. Nor does plaintiff question the right of the Bureau to terminate the agreement in accordance with its terms.

ing 86 per cent is privately owned or leased from the State of Montana.[12] Plaintiff argues that it would be manifestly unfair and contrary to the terms of the agreement to permit the Bureau unilaterally to reduce grazing allotments on *all* the land without giving plaintiff a voice in determining grazing capacity.

On the other hand, defendants contend that construing the contract in the light of the Taylor Grazing Act, the determination of grazing capacity must be made by the Bureau, and that if the contract does not so provide, it was beyond the scope of the agency's authority.

Initially for determination is the question of whether the contract provides that grazing capacity shall be determined by the Bureau, as defendants contend, or jointly by the Bureau and the District, as plaintiff contends.

The provisions of the Taylor Grazing Act upon which the respective parties rely are:

"The Secretary of the Interior shall make provision for the protection, administration, regulation, and improvement of such grazing districts as may be created under the authority of section 315 of this title, and he shall make such rules and regulations and establish such service, enter into such cooperative agreements, and do any and all things necessary to accomplish the purposes of this chapter and to insure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, to provide for the orderly use, improvement, and development of the range; * * * 43 U.S.C. § 315a.

"The Secretary of the Interior is authorized to issue or cause to be issued permits to graze livestock on such grazing districts to such bona fide settlers, residents, and other stock owners as under his rules and regula-

tions are entitled to participate in the use of the range, upon the payment annually of reasonable fees in each case to be fixed or determined from time to time, and in fixing the amount of such fees the Secretary of the Interior shall take into account the extent to which such districts yield public benefits over and above those accruing to the users of the forage resources for livestock purposes. * * * Such permits shall be for a period of not more than ten years, subject to the preference right of the permittees to renewal in the discretion of the Secretary of the Interior, who shall specify from time to time numbers of stock and seasons of use. * * * " 43 U.S.C. § 315b.

Regulations promulgated by the Secretary include the following:

(a) "The District Manager, after recommendation by the advisory board, will rate the grazing capacity of each unit or area in a grazing district and will classify each for the proper seasons of use and for the maximum period of time for which any licensee or permittee will be allowed to use the Federal range therein during any one year." 43 C.F.R. § 4111.3–1(a).

Section 4111.4 provides for adjustment of grazing privileges, both increases and reductions. Section 4114 provides for advisory boards and local associations of stockmen. Section 4114.4–3 relating to powers of local associations provides, inter alia, that local associations shall be authorized "(c) To act in an advisory capacity in the administration of Federal range lying within the district", and "(e) To enter into cooperative agreement for any of the foregoing purposes or for any of the purposes authorized by the act". There is no provision in either the Act or Regulations expressly authorizing a cooperative agreement to fix the grazing capacity of federal lands.

12. The Government owns 80,300 acres. The District owns 786 acres and controls 14,265 acres of state land by lease. 455,214 acres are in private ownership and 12,335 acres of state lands are under private lease.

Regulations issued pursuant to the Taylor Grazing Act have the effect of law. Wilkinson v. United States, D.Or. 1960, 189 F.Supp. 413.

Obviously the agreement is not a model of clarity. By isolating the regulation authorizing cooperative agreements and the clause in the agreement that the Bureau will establish a fixed grazing capacity "in cooperation with the State District", the District and Commission make a plausible argument in support of their position. Construing the agreement in its entirety, however, with the Taylor Grazing Act and applicable regulations, I am forced to the conclusion that the Bureau has the duty to fix the grazing capacity, and that with respect thereto the District was acting in an advisory capacity only.

The agreement does not provide for joint determination of grazing capacity by the Bureau and District. Rather, under Section III of the agreement, setting forth the specific obligations of the Bureau, the Bureau agrees to fix and establish, in cooperation with the District, the grazing capacity of federal and District lands. Section IV sets forth the specific obligations of the District, including an agreement to use the federal lands for grazing purposes in accordance with Article III and to fix, subject to the approval of the Bureau, the numbers and kinds of livestock, not in excess of the grazing capacity.

Plaintiff had been advised of the results of the Bureau's survey in the spring of 1967. By letter dated May 2, 1967, the Bureau agreed that compliance with the certifications for that year would not be required since they were submitted to plaintiff subsequent to the regular allocation meeting, but plaintiff was informed that "certifications for the 1968 grazing use will have to be adhered to". At that time plaintiff knew that the Bureau would insist upon its certification as to grazing use in 1968. Plaintiff had the option to terminate the agreement or attempt to persuade the Bureau to change its certification or otherwise agree to continuance of the grazing capacity then in effect.[13]

When it was clear that the District would not acquiesce in the new certifications, the Bureau gave notice of the termination of the agreement.

A difficult question is presented by a poorly worded agreement. Counsel for plaintiff and intervenor, both in written briefs and oral argument, have contended most vigorously that (1) the agreement provides for joint determination of grazing capacity by the District and Bureau and (2) that this is authorized by the provision for cooperative agreements. Although my own construction of the Act and agreement differs from that of plaintiff and intervenor, I confess considerable sympathy for plaintiff's position, particularly under the factual situation presented to the court with respect to grazing conditions during 1968. The agreement is now terminated. I would hope that counsel might agree upon the proper fees to be paid for 1968 in the light of this decision and that any further litigation will be avoided. It does not appear that the Government has sustained any actual loss through excessive grazing during 1968.

The motion to dismiss is granted.

---

13. There is no evidence that the plaintiff took action of any kind between May, 1967, and January, 1968. It is unnecessary to consider whether the plaintiff had any right of administrative appeal from the Bureau's certification.